EMMA SCHENKMEYER, Appellant, v. BEN ALTHEIMER and LOUIS ALTHEIMER, Doing Business as BEN ALTHEIMER & BRO. REALTY COMPANY; L. W. McMORROW, A. D. RUTH, MURAD ABLAN, ANNIE ABLAN and JULIUS HALLER REALTY COMPANY.—37 S. W. (2d) 944.

Division Two, April 14, 1931.

*John B. Dale* and *Mason, Goodman & Flynn* for appellant.

*Hausner & Versen* and *Harry A. Frank* for respondent.

DAVIS, C.—This is a suit in chancery to rescind an executed contract for sale of real property based on fraud and to cancel notes, and, in addition, to recover the consideration paid, and, as a corollary thereto, to enjoin the foreclosure of a second deed of trust on said property executed and delivered by plaintiff in part payment of the purchase price. The defendants comprise the realtors negotiating and handling the sale, the trustee in the deed of trust and the vendors of the real property. The court rendered judgment for defendants. Plaintiff appealed.

The facts adduced in behalf of plaintiff warrant the finding that, on October 12, 1926, Murad and Annie Ablan, husband and wife, owned real estate in the city of St. Louis, comprising seventy-five front feet of ground, with buildings thereon, known as 2331-33-35-37 Chouteau Avenue. Julius Haller Realty Company, a corporation, was the agent of the Ablans as to a sale of the property. A. D. Ruth was president of said corporation, and L. W. McMorrow vice-president, as well as the trustee named in the second deed of trust. Ben Altheimer & Bro. Realty Company, a copartnership, was composed of Ben and Louis Altheimer, brothers, doing business as real estate agents. Maurice Altheimer, another brother, a salesman, was given desk room in their office, dividing commissions under conditions. Plaintiff also was in the employ of said copartnership, as a bookkeeper and cashier, and so remained from July 7, 1923, to April 30, 1927. She received a salary of $100 a month.

Plaintiff testified that on June 5, 1924, she purchased real estate

in the city of St. Louis, known as 3944-46-48 Folsom Avenue, and on August 6, 1925, she sold same and received in payment thereof a note for $6,000 secured by a second deed of trust on said Folsom Avenue property and $950 in cash. The Folsom Avenue property was bought and sold for her by the copartnership. In the interim, the copartnership collected the rents for her, applying the income to the payment of notes and property expenses, the items of all of which she entered in the cash book. Monthly statements were rendered her.

Plaintiff further testified that she had theretofore acted for the copartnership on occasions as a straw party in real estate transactions. On or about October 12, 1926, Ben Altheimer approached her and represented that he had been employed by the Missouri Pacific Railroad with respect to the purchase of a certain parcel of land on Chouteau Avenue, and said that, if the real purchaser was known, the land would cost $23,500, but that by purchasing it in her name and using the $6,000 deed of trust owned by her, it could be obtained for $21,500. He represented that the railroad would take over the parcel thereafter and that she would be reimbursed for the use of her name and deed of trust. Plaintiff said that she consented to the proposition as put, and thereupon signed an earnest money receipt or contract, and, as earnest money, executed and delivered a check for $250. She borrowed or was advanced this sum by the Altheimers, but later paid the loan. The earnest-money contract designated $21,500 as the purchase price of the property, and provided that the vendor was to accept the $6,000 note and deed of trust in part payment of the purchase price. Also in payment of the purchase price, plaintiff was to execute a first deed of trust for $10,000 due in three years, and a second deed of trust for $5250, due in three years, payable monthly.

Defendants' depositions, offered in evidence by plaintiff, show that this offer as presented was rejected, because, among other reasons, the Ablans were unable to sell and cash said $6,000 second deed of trust except at a discount of twenty per cent. Thereupon Ablan advised his agent, Ruth, that as certain expenses and commissions to close the deal were entailed, he and his wife would accept for the property the sum of $19,500 net. The transaction was later consummated on this basis. Ben Altheimer took said $6,000 second deed of trust and sold and cashed it at an expense of $294, which he charged to plaintiff. The real estate agents representing the Ablans, and the Altheimers representing plaintiff, divided the excess over $19,500 (or $2,000 less expenses) between them. Each set of agents received $782.63. Plaintiff testified that she did not know that the original proposition had been rejected, or that the deal was to be consummated on the basis of $19,500 net to the Ablans, until she learned it from depositions taken, or that the $6,000 deed of trust

had been discounted, or that the agents had divided profits or commissions.

A statement of the deal or transaction was rendered plaintiff by the Julius Haller Realty Company, agent for the Ablans. It shows that the deal was consummated on the basis of a purchase price of $21,500 for the property and the use of the proceeds of the $6,000 deed of trust as part of the purchase price. The statement also showed the adjustments between the Ablans and plaintiff, and advised plaintiff that there was due and owing by her a balance of $195.45, which she paid. The Altheimers collected the rents upon the acquisition of the Chouteau Avenue property until April 30, 1927. From December 1, 1926, until April 30, 1927, monthly statements were rendered to her by them. These statements showed collections of rents and disbursements, including repairs and the payment of monthly notes on the second deed of trust. They also showed a deficit or balance owing by plaintiff to the Altheimers. On April 30, 1927, plaintiff said she was discharged by the Altheimers. At that time she relieved them of the handling of the property, placing the rental account elsewhere. She said that a deed to the Chouteau Avenue property was never delivered to her. Shortly after December 1, 1926, she asked Ben Altheimer to live up to his agreement, and requested that the Missouri Pacific take over the property, but he asked for more time. These requests from time to time she repeated, but he continued to ask for further time, until on April 30, 1927, he advised her that she was the purchaser of the property and would have to shift for herself as he had troubles of his own. During the time the Altheimers collected rents for her, the disbursements exceeded the income from the property. The statement of April 30th showed a balance due by her of $122.36.

On May 10, 1927, a monthly note of $123.75 on the second deed of trust became due, as did a $300 semi-annual interest note on the first deed of trust. On said day Altheimer wrote plaintiff that the holders were threatening foreclosure unless paid. Ablan was the owner of said notes, and he testified that no such request was then made. Pursuant thereto and in order to save her live savings, as plaintiff testified, she procured Altheimer to purchase certain shares of stock held by her in one of his enterprises for $400, which she applied to the payment of the notes. The copartnership (Altheimers) paid the repair bills on the property as they came in, and plaintiff entered such in the cash book. Plaintiff testified that Altheimer handed her the notation and she entered on the copartnership cash book the following:

"Commission—Sales Commission on sale 2331 Chouteau Avenue, $522.50.

"Loans—Refinancing, etc., on $6,000 second deed of trust, 3944-48 Folsom Avenue, $260.12."

She said that the entries were made under Altheimer's direction, and that she had no idea where the money came from or who paid it. On June 4, 1927, she wrote Ben Altheimer the letter, reading:

"As things are at a standstill with me at the present time, I feel that I must take measures to change the present conditions. The property on Chouteau Avenue is quite a worry to me. I feel that I cannot endure the responsibility much longer, so, therefore, I have decided to work hard to rid myself of it. I am asking you not to feel hurt, as I am taking the account from your firm and listing it with another. Perhaps this will be better for both. Kindly send me a final statement of my rent account, also all bills and key for No. 2337. I shall send you check by return mail. Sincerely would appreciate the return of my money in Ferguson Home Site Company."

Her interest in the Ferguson Home Site Company was purchased by Altheimer later for .$1105, seemingly after this suit was instituted. At the time of the request to act as a straw person, Altheimer told her that the Chouteau Avenue property was worth $22,-500. Real estate experts, witnesses for plaintiff, testified and placed the value of said Chouteau Avenue property between $13,500 and $14,500.

Plaintiff read in evidence the deposition of Ben Altheimer. He testified that he was not employed by the Missouri Pacific Railroad to purchase for it the Chouteau Avenue property; that plaintiff one morning came to him with a newspaper clipping relative to property on Chouteau Avenue, and advised him that this was a parcel of property she desired to purchase. He told her that he was too busy, to see Morris (Maurice) Altheimer with respect to it, and he understood later that she and Morris were negotiating for the property and desired to make an offer of $21,500 for it, asking him to draw the papers. Plaintiff had confidence in his ability, he said, to close the deal correctly, and asked him to see that it was closed all right, and he said he would. He said that he did not act as her agent. He further testified that Ablan refused to accept, as part payment on the purchase price, said $6,000 second deed of trust. So he cashed and sold it to a Mr. Bowden, the owner of the Folsom Avenue property, and used the proceeds in part payment of the purchase price of the Chouteau Avenue property.

Plaintiff also offered in evidence the deposition of defendant Ruth, in which Ruth stated that the Altheimer copartnership acted as agent for plaintiff in the transaction; that there was no commission paid to anybody on the deal, but that a profit was realized in lieu of commissions, and that after deducting expenses, his company divided $1565.24 with the Altheimers, which was $520.24 more than the regular commission on a $21,500 sale.

674

*Evidence of defendants Altheimer.* Ben Altheimer testified on the trial in accordance with his deposition summarized. He further said that he did not discharge plaintiff, but that she left of her own accord; that she never demanded that he take over the Chouteau Avenue property; that the copartnership was not the agent of plaintiff in acquiring the property, but that they acted as her agent. in closing the deal; that Morris Altheimer represented and negotiated the deal for her. Morris Altheimer was a salesman with desk room in the office of the copartnership, and one-half of the money earned by Morris, under the arrangements, went to the copartnership.

Several carpenters and repair men, whom the Altheimers usually called upon when property for which they were agents needed repair, testified that plaintiff personally employed them to repair the Chouteau Avenue property, although their bills for the repairs were paid by the Altheimers, so long as plaintiff remained in their employ. One testified that plaintiff, in the fall of 1926, asked him to estimate the cost of certain repairs to the building, and upon being informed that the repairs would run from $1,000 to $1200, she stated that she did not desire to spend that much money on the place.

Morris Altheimer testified that plaintiff originally came to him with a newspaper clipping relative to the property, saying that she desired him to get a price on it. Upon inquiry, he advised her that the price was $23,500, and she asked him to see if he could not get it for less; that he went to the Haller Realty Company office with an offer of $21,500, and reported to plaintiff that he could get it for her at that sum; that she was willing to pay it and desired to put up her $6,000 second deed of trust as part of the purchase price. Ben Altheimer was called in to prepare the contract, which was done, and, after plaintiff signed it, Ben and Morris went with it to the Haller Realty Company office. Thereafter Ben Altheimer took charge of the deal. Morris received a percentage of the share of the profits realized by the copartnership. Miss Schenk, an office employee of the Altheimers, stated that plaintiff quit her employment, stating that she was not treated right because the Altheimers raised her (Miss Schenk's) salary. Morris Altheimer said that, prior to the purchase. with plaintiff he visited the Chouteau property and he and plaintiff together inspected it, going through the buildings. (Plaintiff said that, before she signed the earnest-money contract, she never went through the buildings, but just passed, and that she did. not ask either Ben or Morris Altheimer about the value of the property). Ben Altheimer denied that he represented that he was agent of the Missouri Pacific Railroad, and denied that he requested plaintiff to loan him the $6,000 second deed of trust to purchase the property in her name. Ben Altheimer testified that he told plaintiff that there was an expense in cashing and selling the $6,000 second deed of trust, and that he and Morris were to get their share of the com-

mission, and that he would have to get some money out of the deal if he had to do more work; that plaintiff replied that what she wanted was to have the Chouteau Avenue property, and to go ahead and do the best he (Altheimer) could. (Plaintiff denied this conversation). Altheimer's witness, one Christy, testified that he heard plaintiff say, "Go ahead and discount it so that I can buy the property." Another witness, Fuqua, said that he heard Altheimer tell her that the deed of trust would have to be discounted. The customary discount on a second deed of trust was from fifteen to twenty per cent. It was discounted for $294.

The evidence on behalf of the other defendants tended to show that the proposition of taking the $6,000 second deed of trust as part payment of the purchase price of the property in question was refused by the Ablans, the owners, because it was figured that it could not be discounted for less than fifteen or twenty per cent. Ablan then suggested to Ruth, his agent, that he would give the Haller Realty Company a net figure of $19,500 on the property, and that, in lieu of commissions, said corporation could have all over $19,500 that the property sold for. Thereupon, seemingly, to place the title so as to enforce the agreement, at the suggestion of Ruth, on October 14, 1926, the Ablans executed an earnest-money contract to one Emma Weiberg (a straw party) or assigns, to sell said property for $4250 cash and for a first deed of trust for $10,000 and a second deed of trust for $5250 on said property.

Subsequently, the Haller Realty Company advised the Altheimers that the proposition presented by plaintiff was not acceptable, and informed them that the property could be purchased for $19,500 net to the owner. Altheimer then arranged to sell and discount plaintiff's $6,000 second deed of trust, whereupon Emma Weiberg accepted plaintiff's offer of October 12, 1926, as shown by the earnest-money contract offer. On November 9, 1926, the Ablans conveyed the property directly to plaintiff, and settlement was made with plaintiff on the basis of $21,500, in accordance with her offer of October 12, 1926, and with Ablan on the basis of $19,500, in accordance with his contract of October 14, 1926.

Other facts will probably appear in the opinion.

I. This is a suit in equity, triable here *de novo*. However, as the chancellor below heard and observed the witnesses and their actions, deference will be accorded to his conclusions, but, notwithstanding, it is the duty of the appellant court to digest, weigh and interpret the evidence and to determine the facts.

One theory of plaintiff's right of recovery is predicated on the postulate that she acted, at the request of Altheimer, merely as a repository of the title to the real estate until it could be conveyed

to the Missouri Pacific Railroad; and that she permitted, at his instance, the use of her $6,000 second deed of trust in part payment of the purchase price of the property. Altheimer denied the facts hypothesizing the postulate and declared that plaintiff initially approached him, saying that she desired to purchase the property in question.

In determining the weight of an issue of fact, consideration should be accorded to the surrounding circumstances and the inherent probabilities of the verity of the evidence. Illustrative of the declaration, in Taylor v. Morris, 163 Cal. 717, 127 Pac. 66, it is said that an explanation of a transaction, given in a contemporaneous writing before any differences have arisen is of more weight as evidence than a subsequent oral explanation at variance with the writing, given after differences have arisen. In this connection, the gist of plaintiff's letter to Altheimer, dated June 4, 1927, is to the effect that she owned and held property, and it tends to deny that she was the mere repository of the title for the railroad.

The inherent probabilities of the evidence weigh against the probability of the verity of plaintiff's testimony. She not only permitted the use of her deed of trust, but she placed in escrow a check for $250 of her own money as earnest money, and, to close the deal, paid of her own money $195.45, purporting to be due by her in adjustment of the transaction. These facts do not appear to accord with her position now taken. Subsequent to the collection of rents and expenditures for repairs and charges, she knew that the copartnership charged deficits to her, for entries were made by her in the cash book. She did not, on April 30, 1927, when Altheimer declared to her that she was the owner of the property and would have to shift for herself, take steps to bring him and the other defendants to account, but continued to deal with the property as her own. Subsequently, when $123.75 monthly note and the $300 semi-annual interest note became due, instead of protesting to Altheimer or attempting to make him account, she procured Altheimer to purchase stock owned by her in one of his enterprises for $400, which she applied to the notes due. Notwithstanding he was frequently used by the copartnership to repair buildings for landlords employing them, we are impressed with the probability of the verity of the testimony of a carpenter that plaintiff, in the fall of 1926, requested and was furnished by him an estimate of certain repairs to the property, which amounted from $1,000 to $1200, and which she refused to approve because of the cost. This incident, which we find probably occurred, shows that she exercised dominion over the property and denies her assertion that she was a mere repository of the title for the railroad. While it is of slight probative value, nevertheless, under the facts, it is a circumstance to be weighed that she had therefore purchased and sold the Folsom Avenue property, to her advantage.

On this phase of the case, the inherent probabilities of the evidence favor defendants, forcing the determination that plaintiff, *ab initio* originated the concept and purpose to purchase the property, and that she did purchase it for and on her own account.

II. Plaintiff testified that at the time Ben Altheimer requested her to act as a straw person with respect to the Chouteau Avenue property, he declared that it was worth $22,500. Plaintiff's theory of recovery was based on her status as a repository of the title for the benefit of the Missouri Pacific Railroad. Plaintiff now advances the theory and argues that the representation that the property was worth $22,500 was fraudulent. The two theories prima-facie appear to be inconsistent, but we need not determine them so, as the question is not before us, because plaintiff failed to aver or rely upon that representation in her petition. In addition, according to our interpretation of the evidence and the facts, there seemed to be no occasion for Altheimer to make the representation. If, as plaintiff averred and contended, she was to act as a mere repository of the title at the instance of Altheimer, what reason obtained for a statement by Altheimer that the property was worth $22,500? If it was made, it was evidently not made with the intention to deceive or to be believed. And if plaintiff relied on the fact that she was a mere repository, she did not rely upon the statement as to value. Taking into consideration the inherent probabilities of the evidence, it is our finding that the statement was not made.

III. Ben Altheimer testified that he was not the agent of plaintiff in the transaction, but that he was called in to close the deal for her. Plaintiff so contends, and avers that his declaration that he was not her agent renders his testimony unbelievable. The declaration would have weighed against him had he not fully disclosed the facts as to his participation in the transaction. The declaration, in view of his further testimony freely given, was merely his interpretation of his actions and services, to be regarded as his conclusion deduced from the facts. We do not think that this declaration rendered his testimony unbelievable.

IV. Plaintiff contends that, after Ablan had rejected her offer to purchase the property for $21,500, which offer included, besides the cash and the notes secured by deeds of trust, the acceptance of her $6,000 second deed of trust in payment of the purchase price, Altheimer and Ruth entered into a conspiracy to defraud her by the agreement with Ablan, in which he agreed to take $19,500 net to him for the property, the remainder, $2,000, to be paid for services in lieu of commissions.

The evidence shows that this arrangement was agreed upon between Ablan and Ruth, as Ablan did not desire to accept the $6,000 deed of trust, so offered by plaintiff, at its face value, it being understood between them that the discounting of the deed of trust and other certain expenses were to be borne by Ruth, and any balance remaining to become the property of Ruth in lieu and in full of commissions. Such arrangement between Ablan and Ruth was legal, for, as to an agreement for compensation, they dealt at arm's length. [9 C. J. 581.] It follows that the agreement *per se* was no concern of plaintiff, for she legally could not be interested or affected by the compensation agreed upon and paid as between principal and agent.

It is said, however, that Ruth knew that Altheimer was plaintiff's agent and that, by the agreement to divide the excess over $19,500, in lieu of commissions, Altheimer breached his duty to purchase the property for plaintiff at the lowest price possible, in which breach of duty Ruth participated. In this contention, plaintiff overlooks the fact that she had offered $21,500 for the property, and that the compensation to be paid by the vendor to his agent for the sale of real estate was a matter in which they were alone concerned. The contract between Ablan and Ruth as to the excess in lieu of commissions was not agreed upon until subsequent to plaintiff's written offer of $21,500. The facts show that Ruth hazarded the amount of compensation he was to receive, as it depended upon the discount percentage of the $6,000 second deed of trust. So far as plaintiff was concerned, we see no illegality or fraud in the agreement between Ablan and Ruth relative to the compensation to the Haller Realty Company for its services as sales agent. Plaintiff offered in writing to purchase the property, under terms and conditions, for $21,500, and it does not appear that it could have been bought for less money under the offer as made.

V. The preponderance of the evidence shows that plaintiff conceived and originated the desire to purchase the property, and that, from the beginning, she directed negotiations, notwithstanding she procured Morris Altheimer to negotiate the purchase price and called upon Ben Altheimer to close the deal. It is evident, we think, that she understood and knew that the Altheimers did not expect to receive from her, nor she to pay, compensation for services rendered by them in her behalf. It may be inferred that she was not wholly a neophyte as to real estate transactions, for she had had over three years' experience in their office in charge of the cash book and the purchase and sales account.

In this connection, the evidence unequivocally shows that the agents for the vendor and the vendee in the transaction pooled and divided what may be termed the commissions paid by the vendor. It is the general rule of law that an agreement between real estate brokers to

pool or divide the commissions is against public policy, unless done with knowledge and consent. [9 C. J. 571.] Relative thereto, the evidence of Altheimer tends to show that he advised plaintiff that the owner of the property had agreed to take $19,500 net for it, and that the Haller Realty Company would receive one-half of the commissions and the Altheimers the other one-half, but that charges for discounting and financing the deal would be deducted. This testimony is supported to some extent at least by the testimony of witness Christy that he heard plaintiff say, "Go ahead and discount it, so that I can buy the property," and by witness Fuqua that he heard Altheimer tell plaintiff, upon inquiry by her as to how soon he could close the deal, that he would have to cash some paper before that could be done. The foregoing evidence tends to show that plaintiff knew and consented to Altheimer receiving one-half of the commissions and that she was advised that the owner agreed to take $19,500 net for the property, and that the excess, less charges, was agreed upon in lieu of the regular commissions. It is frequently a difficult matter, as it is herein, to determine a question of fact, but, when we consider that plaintiff had had some experience in realty matters, that she was to pay no commission, that the Altheimers were expending energy and time in her behalf, we think the inherent probabilities of the testimony preponderate in favor of the verity of Altheimer's testimony that plaintiff knew the foregoing conditions and consented to the division of the commissions between the agents.

VI. We see no fraud affecting plaintiff in the fact that Ablan entered into an agreement to sell and convey the property in question to Emma Weiberg, which was executed to protect the Haller Realty Company with respect to the commissions. However, the property was conveyed by deed by Ablan and wife to plaintiff, resulting that plaintiff lost none of her rights against the real parties in interest. We are unable to see that plaintiff was injured or defrauded in any manner by the procedure adopted.

VII. Plaintiff contends that the trial court erred in receiving in evidence the rules of the St. Louis Real Estate Exchange offered for the purpose of showing that it was permissible for the agent of the buyer and the agent of the seller to divide the commissions paid by the seller. We need not determine that the court erred in that regard, for we have determined the facts and found that the preponderance of the evidence weighs in defendants' favor, irrespective of the testimony. Consequently, in reaching our conclusions, we have disregarded the evidence.

The judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.