P. George Schutz, Respondent, v. Great American Insurance Company et al., Appellants.—103 S. W. (2d) 904.

Kansas City Court of Appeals. April 5, 1937.

*Franken & Timmons* for respondent.

*Morrison, Nugent, Wylder & Berger* and *Douglas Stripp* for appellants.

BLAND, J.—This is an action arising before the compensation commission. The case was heard before a referee, who found that claimant was not in the employee of the defendant, Great American Insurance Company. On review before the full commission claimant was awarded compensation in the sum of $700.92 and reimbursement·for medical aid in the sum of $733, the commission finding that claimant was an employee of the Great American Insurance Company; that the company had notice of the accident and that the employer and insurer failed to furnish claimant medical aid. One of the commissioners dissented. The case was appealed by· the defendants to the circuit court where the award of the commission was affirmed. Defendants then appealed to this court.

The facts show that the defendant, Great American Insurance Company, is engaged in the fire insurance business; that Mrs. Elsie Schutz Berning, a sister of the claimant, was the owner of a frame house in Carrollton, on which the said defendant was carrying a fire insurance policy in the sum of $11,000, and that on the afternoon of Sunday, December 18, 1932, the house was badly damaged by fire and water. The policy was issued through D. D. Thomas, the local agent in Carrollton for said insurance company. Thomas also acted as adjuster for the company in settling the loss. The policy contained a provision that the company could either make a cash settlement or repair or replace the property damaged.

Claimant was a resident of Norborne, a nearby city, and was engaged in the hardware, grocery, plumbing and electrical business, owning a store in that place. He also owned and supervised a 300-acre farm.

Claimant's theory is that he was employed by the fire insurance company, through Thomas, to rebuild and repair the damaged portion of the house, defendants insisting that he was doing the work for his sister.

The facts show that claimant and Mrs. Berning lived together in Norborne. The house in question was occupied by their parents. Claimant's evidence shows that Mrs. Berning was unable to go to Carrollton at the time of the fire, resulting in claimant and her father, as her representatives, meeting Thomas at the damaged house on the morning (Monday) following the fire. Thomas remarked that it was going to be a hard loss to adjust and "we are going to reserve the right to put it back the way it was." Claimant's father carried a policy of fire insurance with the fire insurance company upon the furniture in the house in question. Thomas was anxious that a temporary roof be placed upon the house, as the roof had been burned off. He asked claimant if he could get the necessary roofing by the next morning and the latter answered in the affirmative. He then asked claimant who the former could get to do the work and if the claimant had any men. Claimant said he had. Thomas then stated: "I won't have any 75¢ or $1 an hour men on this job." Thomas later said: "'Next thing we have got to figure this material out, what we are going to need.'" "He said," "'We are not going to be held up by none of these lumbermen.'" He asked claimant if the latter knew what it would cost to buy the lumber. Claimant said, "No." Thomas told him to go to Norborne and see what "we could buy the lumber for." This lumber was not only for the temporary roof but "for the whole building." Claimant went to Norborne and inquired of various lumber yards there as to prices. He returned to Thomas' office about 10:30 A. M. Thomas then said: "'I already bought the lumber over here at Hurley Lumber Yard,'" "and I told he (him) what the men (workmen) wanted up there, and he said, 'That is fair enough. Go out and go to work.' What did you tell him the men wanted? A. 65¢ an hour. Q. What did he say? A. Said it was fair enough."

It appears that Thomas, in his work as adjuster, was required to be out of the city a great deal of the time so he told claimant: "'I won't be able to be here.'" "He said," "'I am going to turn it over to you.'" Claimant volunteered to take 50¢ per hour for his individual work. It appears that Thomas and the members of the Schutz family were friends of long standing. Claimant testified that he had been getting 65¢ to 75¢ per hour for all of his time in doing repair work but charged only 50¢ per hour on this occasion because Thomas and he were friends.

Thereafter, claimant went to Norborne and engaged two carpenters who were his personal friends and customers. Claimant accompanied by Mr. Renzelman, one of the carpenters, went to the office of Thomas about noon of the day after the fire. Renzelman suggested that it would be better to put on the permanent roof at once instead of a temporary roof, which Thomas agreed was the

thing to do. He told the two men to "go ahead and go to work" and to start tearing off the old burned rubbish. Before leaving on his out of town trips Thomas would lay out the work that claimant and the men were to do on the house, which they would perform and then await instructions from him before proceeding further.

On the Tuesday after the fire Mrs. Berning asked Thomas if it would not be possible to have a cash settlement and he promised to make an estimate for that purpose but he told her if a cash settlement was not made the house would be replaced in as good shape as it was or even better; that "We are friends and this is all just like it was in one family, and we are going to give you a square deal out of it." On Wednesday Thomas told claimant that "We . . . can't figure on a cash settlement. . . . We are going to go ahead and replace the building, go ahead with your work."

Thomas made arrangements to get the lumber and materials from the Hurley Lumber Company and told claimant where to procure the same. During the time that claimant was working on the house Thomas told him, on several occasions, to keep the furnace going in order to dry out the house. He told him to get the paint, to prime the new lumber, to get the shingles and put them on the roof, to order the rubbish hauled away, to completely replaster the house, to repair the flue, and to buy some items of repair from the La-Crosse Lumber Company. Thomas was at the house between seven and ten times giving orders. Claimant did no work upon the house that was not directed by Thomas and the latter approved of all of the men that were hired by claimant.

Claimant and his sister talked over each night what she desired in the way of repairs on the house and claimant would take the matter up with Thomas and then the work would be done if Thomas approved. Nothing was done that Thomas did not agree to.

Thomas' son, who was the attorney for the fire insurance company, told claimant that the company issued but one check in payment of a loss and for him to pay the men and the company would reimburse him but to keep "the time on these men," all of which claimant did.

The above facts were not only testified to by claimant but Renzelman testified that Thomas said: "The insurance company is going to put the house back like it was." Mrs. Berning testified that Thomas agreed to repair the house and that she did not employ claimant. The evidence further shows that Thomas went to the Hurley Lumber Company and asked about prices of materials and stated that they were wanted for the Schutz fire loss; that the following day he went back and arranged for the buying of the materials and said he would send down and get them. Thomas said to the lumber company: "We are going to repair the Schutz house." He did not say to charge the lumber to Thomas or the insurance com-

pany, but under such circumstances it was customary for the lumber company to charge the materials to the person ordering them, so it charged them to Thomas. In all $500.71 worth of materials were procured by the claimant from the Hurley Lumber Company upon Thomas' order. After claimant was injured the bills were turned over to Thomas and he went to the lumber company protesting that the bills were charged to him. They were not paid and later, in order to save the expense of filing a lien, the lumber company was willing to take, and did take, claimant's note for the materials but still retained on its books the charge against Thomas.

Claimant was injured on January 29, 1933, and did no more work on the house after that time. At the time plaintiff was injured the repairs on the house were not finished. The floors were not finished or replaced, the painting and papering was to be done and "all inside work to be refinished." In reference to claimant's injury, the evidence shows that Thomas repeatedly told claimant to keep a fire going in the furnace in the house, not only in order to dry out the house but to keep the plastering that had been put on the walls on the upper floor from freezing, the time being midwinter. It appears that a fire was built at the time claimant, his father and Thomas first met at the house to talk over the loss and that Thomas assisted in building this fire. It was dark in the house and there was no way of lighting it artificially, as the current had been cut off, and in firing the furnace claimant would go to the cellar through outside wooden doors. There was sufficient from which the commission could have inferred that Thomas knew of the presence of these doors and their probable use by the claimant in entering the cellar to fire the furnace.

On Sunday, January 29, 1933, about 2:30 or 3:00 P. M., claimant was at the house for the purpose of rebuilding the fire to keep the plaster from freezing. In unlocking the padlock on the wooden doors of the cellar he ran a splinter in the thumb of his right hand "right in under the thumb nail." He fired the furnace and remained at the house for an hour and a half or two hours. The splinter caused pain in his hand so, before going to work the next morning (January 30th) he saw Dr. Munson at Norborne, who removed the splinter, stating that "It won't amount to anything." He then went to work upon the house but after driving three nails quit because of the pain in his hand. (He had been doing carpenter work). He stayed at the house over-seeing the work until quitting time when he returned to Norborne. There was a burning and a throbbing pain in his hand all that day. That night he again went to see Dr. Munson, who looked at it and said: "That won't amount to anything." It is just soreness. Go home and soak it in hot water and tomorrow morning it will be all right." Claimant went home and treated his hand but about three o'clock in the

morning it pained him. so that he had to get up from his bed. He was suffering such pain that he had difficulty in getting back to bed. On January 31st (the next morning), about five o'clock, Mrs. Berning called up Dr. Benson, who operated a hospital at Carrollton. There was some question as to whether claimant would be able to make the trip to Carrollton and the doctor offered to come to Norborne but claimant was able to go to Carrollton, arriving there about seven o'clock in the morning. He went to Dr. Benson's hospital where the doctor found that he had blood poisoning. Dr. Benson operated on the hand four times. The first time claimant entered the hospital he remained twenty-two days. He again went back on March 10th for a third operation on his hand and remained until March 21st. His hospital, nurse's and doctor's bills amounted to $569. After leaving the hospital the second time claimant made periodical trips to the doctor's office for treatment. Claimant promptly paid all of his hospital, doctor and nurse bills without calling upon Thomas or the fire insurnace company to pay them.

Claimant went to the hospital on January 31st, and before he was operated on that morning he sent word for Thomas to come and see him. Thomas came to the hospital. This was the first time that Thomas knew that claimant had received an injury. Thomas, in his testimony, denied that he was told, at any time, that the injury was received while claimant was working upon the house in question. He testified that he was never told where it was received. The evidence concerning this matter will be stated later more in detail.

Mrs. Berning called to see Thomas the morning claimant was taken to the hospital and after that event, and Thomas asked her to bring over the bills covering the repairs on the house, she went to the hospital and procured the bills from her brother's coat. She also procured some from his desk in Norborne and delivered all of them over to Thomas. About a week after she turned over the bills to Thomas he came to see her, at her request, because Renzelman had completed the work which was being done at the time claimant was injured and the latter wanted to know "what would be the next work to be done on the house." Renzelman wanted to know if the floors were to be replaced and Mrs. Berning asked Thomas to replace them because the floors "were in perfectly terrible condition," they were warped and buckled up and were in a "A" shape. Thomas said the fire insurance company would not replace them. The following morning Mrs. Berning called on Thomas and suggested that there be a settlement of the bills and an estimation of the remaining work to be done to finish up the house.

It appears that Thomas did not object to the bills and agreed to an estimation of the cost of finishing the house. Mrs. Berning had an estimate made, which came to about $3000. Thomas said

that this estimate was too high. Neither Thomas nor the company did anything further. It appears that the company tendered Mrs. Berning the sum of $1700 in payment of the loss, which was not accepted. No work was done after the dispute concerning the replacing of the floors arose and commencing about six or seven weeks thereafter the repairs on the house were completed by Mrs. Berning and it was re-occupied by her parents.

When claimant went to the hospital labor and material of the value of $1589 had gone into the house. Claimant purchased the material bills and, as before stated, he gave his note to the Hurley Lumber Company for the materials bought there. The fire insurance company refused to pay him and on August 14, 1933, he brought suit for $1589 with interest. On February 13, 1933, Mrs. Berning wrote the company at Chicago, stating: "We have presented our bills to your agent and adjuster D. D. Thomas of Carrollton, Mo., and the payments have been refused. I have the house partly repaired and the estimates on the balance. . . . It seems strange that after given authority by your adjuster to go on and repair the house and then after presenting our bills that we should have a flat refusal."

In the month of July, 1933, Mrs. Berning brought suit against the fire insurance company to recover $3750, which amount covered her entire loss. Her attorney claimed that they sued for this amount by mistake. Defendants question the sincerity of this claim. This whole matter is immaterial, as will hereinafter be pointed out.

It is insisted by the defendants that there is not sufficient evidence in the record to uphold the finding of the commission that claimant was an employee of the fire insurance company. It is contended that claimant was doing the work for his sister, the company agreeing to pay for the restoration of the damaged property; that it was not the intention of Thomas to give orders to the claimant or others in regard to the doing of the work but that he was a close friend of the family and was trying to help claimant and his sister out by friendly suggestions; that he discussed with claimant the matter of labor and materials for the replacement of the roof, only; that not only the policy on the house but the policy on the furniture required that the house and furniture should be protected from further loss and that the policies required the company to pay for the expense of so doing; that Thomas also took a lively interest in the matter of repairs because his company was vitally interested in the cost of restoration as it was required to stand that expense under the terms of the policy; that he was interested in having the work done in a proper manner and at a reasonable cost so that the company would not object to reimbursing insured for it; that in discussing the prices of the materials and the labor Thomas was merely conceding, from the company's standpoint, that such

charged would not be objected to by it in paying for the restoration of the property; that it is unreasonable to believe that Thomas would employ the brother of insured to restore the property; that Thomas testified that he had not in his long experience repaired a single house for a fire insurance company as such a company never repairs or replaces, itself, damaged property; that the acts of claimant, particularly the payment of the labor and material bills by him and the procurement of their assignment, the bringing of the suit that he brought against the company and the fact that there is no evidence that he called upon the company to pay these bills before he, himself, paid them, including the hospital, nurse and doctor bills, shows, conclusively, that he did not consider himself an employee of the fire insurance company and these facts should be given more weight than his oral testimony concerning matters which happened a year or more prior to the time he testified.

In this connection, defendants, also, call our attention to the letter that Mrs. Berning wrote to the fire insurance company on February, 13, 1933, which, on its face, seems to be inconsistent with her claim that the fire insurance company, rather than she, was doing the repair work on the house. Our attention is also called to the fact that she filed suit against the fire insurance company to recover the full loss. So far as her letter and the lawsuit are concerned, they are in no way binding upon the claimant. They are clearly incompetent evidence and cannot be considered by us for any purpose. So far as the other contentions of the defendant are concerned, they were for the sole consideration of the commission. It is well settled that on appeal from the commission the court considers only the testimony most favorable to the award together with all reasonable inferences to be drawn therefrom. [Cottingham v. General Material Co., 50 S. W. (2d) 661.] We have read the cases cited by the defendant and find them not in point. The case of Schenkmeyer v. Altheimer, 327 Mo. 666, cited by the defendants was a suit in equity. In such cases the appellate court passes upon the weight of the evidence.

A mere reading of our statement of the facts shows that there is ample competent evidence to sustain the finding of the commission that claimant was employed by the fire insurance company. This evidence was not only that of the claimant but a great deal of it was that of at least three other witnesses, including claimant's father, Renzelmen and Mrs. Berning.

However, defendants contend that that part of the award providing for reimbursement of the cost of medical aid is without support in the record. .Section 3311 (a), Revised Statutes 1929, as amended (see Laws of 1931, p. 381), provides that, in addition to other compensation the employee shall received and the employer shall provide such medical, surgical and hospital treatment, etc., as may rea-

648

sonably be required for the first ninety days after the injury or disability, not exceeding the amount of $750 but that "If the employee desires, he shall have the right to select his own physician, surgeon or other such requirement at his own expense." Section 3311 (c) provides that all such charges shall be fair and reasonable and shall be subject to the regulation of the commission.

It is claimed by the defendants that no opportunity was given them in this case to furnish medical aid, etc.; that neither the defendants or any of their agents were ever notified that claimant had received the injury to his thumb while working upon the house in question; that claimant employed his own hospital and doctors and that, under the statute, he is required to stand the expense thereof.

As before stated, the evidence shows that, shortly after claimant went to the hospital, he sent for Thomas; that Thomas came to see him before he was operated on the morning of his entrance to the hospital. It appears that it was claimant's father who asked Thomas to come to the hospital. His father testified that he called on Thomas and told him that claimant had blood poisoning and was in the hospital; that the two went to that place. "Q. *Did you tell him how he got hurt?* A. *Yes, sir.* I says he was unlocking *the* cellar door and run a splinter in his hand, in his thumb. I said George is up in the hospital." (Italics ours.)

Claimant testified that he talked to Thomas at the hospital. "Q. Did you tell him what had happened to you? A. Yes, sir; when I went to the hospital, before they put me under the ether, I told them to tell Mr. Thomas to come up here, I wanted to talk to him. Q. Did Mr. Thomas come up? A. He did. Q. What was the conversation? A. I was sick that morning and couldn't do much talking, and Mr. Thomas came up and said, 'George, don't worry,' He said, 'We will take care of the job the same as you were out there.' He said, 'Don't bother about a thing,' He said, 'The hospital is the place for you.'" . . . "Q. You said that when Mr. Thomas, Senior, came to see you, you were so weak you couldn't talk? A. I was sick. Q. Did you talk to him? A. I told Mr. Thomas I was sick. I said, I have got blood poisoning,' and he said, 'Don't worry over nothing. You will soon be all right. You are not bad.' Q. Is that all you said to him? A. I don't remember what I did say any more, after I said I was sick; don't recall just what I did say. Q. All you said was that you had blood poisoning and were sick? A. Yes, sir."

Claimant further stated that this was the only time that Thomas came to see him; that the first time he said anything about compensation to Thomas or these defendants was when he filed his claim for compensation, which was on July 22, 1933.

Mrs. Berning testified that when she called on Thomas the day claimant was taken to the hospital, Thomas inquired: " 'Did George

happen to have any accident insurance on this injury' " and I said "He did not and Mr. Thomas says, 'Well, that is too bad for him.' "

It will be noted that the evidence is somewhat obscure on the question as to whether Thomas was notified that claimant received the injury to his thumb while working upon the damaged house. If the employer had no notice or no opportunity to procure medical aid, then it is not liable. [Aldridge v. Reavis, 88 S. W. (2d) 265.]

It is difficult to believe that anyone could have misunderstood what these various persons were talking about when they discussed with Thomas claimant's injury. "The cellar door" was mentioned and there was no cellar door involved except the one at the damaged house. In reference to this testimony defendants say that the witness told Thomas that claimant was injured while unlocking "a" cellar door but we notice that the witness used the expression "the cellar" door. Defendants say that for all Thomas knew claimant might have received his injury on the cellar door of his own house in Norborne. There is no evidence of any such door or that, if there were one, it was of wood. We think the testimony of claimant's father strongly suggests that he did tell Thomas that claimant ran the splinter in his thumb when unlocking the cellar door at the damaged house because he stated that he told Thomas how claimant got hurt. Thomas undoubtedly knew of these wooden cellar doors on the damaged property and when the witness told him that "the" cellar was involved he could not have misunderstood what was meant.

In addition to this, as we have already indicated, the commission was at liberty to find that Thomas employed claimant to repair the house and, in this connection, it will be noted that as soon as claimant received his injury no more work was done on the house after the carpenters finished the work at hand; that Thomas refused to replace the floors which, according to the evidence on behalf of the claimant, certainly were required to be replaced in order to put the house back in proper condition; that although Thomas had ordered the materials from the Hurley Lumber Company, which were ordered under circumstances justifying that company in understanding that they were to be charged to him or his company, after he found out that claimant was injured he attempted to repudiate the matter by going to the Hurley Lumber Company and protesting.

It is not necessary for us to say, as a matter of law, that Thomas after claimant was injured saw the predicament that his company had been placed in by his employing claimant to repair the house and that Thomas was attempting to repudiate his action in that regard or, at least, attempting to make it appear that claimant had not been working for the company. It is sufficient to say that the commission, from the evidence concerning what Thomas was told directly concerning claimant's injury, taken together with his con-

duct after he learned of the injury, was at liberty to find that he was actually informed of where the injury was received and knew of his company's liability therefor.

We think the fact that Thomas was not immediately notified when claimant was hurt did not require the commission to find, as a matter of law, that the latter arranged his own medical attention without giving the employer an opportunity to furnish it. Of course, the statute gives the employer the prior right to furnish medical and other attention and if it was deprived of the opportunity of so doing, then claimant cannot recover this item. However, it was within the province of the commission to find that the injury did not appear to claimant to be of such a serious nature as to warrant his reporting it to the employer on January 29th, the day it was received or, in fact, the 30th. There is an inference to be drawn from the evidence that Thomas was out of the State to and including January 29th and there was no one to notify until January 30th at the earliest. The commission was not required to find that claimant should have called Thomas instead of Dr. Benson on the morning claimant entered the hospital. It will be remembered that claimant was suffering great pain and there was a question as to whether he could even make the trip to Carrollton. Something in the way of medical aid had to be administered at once. As soon as he got to the hospital he sent for Thomas. When Thomas arrived he told claimant not to worry about anything, "the hospital is the place for you." The commission was warranted in its finding that this was an approval by Thomas of what claimant had done in seeking aid at the hospital. The law in reference to matters of this kind is well stated as follows:

"Where the employer has neglected or refused to provide the necessary services or treatment, or has consented affirmatively, or his consent is to be inferred from his inaction, to selection by the employer, or, having knowledge of such selection, has interposed no objection, or where the physician selected by the employer is not available when required, the employee may make his own selection, the fees and expenses to be charged to the employer if they are reasonable. [71 C. J. p. 780.]" [See, also, McComosh v. Shapleigh Hdw. Co., 40 S. W. (2d) 728; Cresbin v. Feldman, 256 N. Y. S. 413; Weisberg v. Alexander Bros. Furn. Co., 256 N. Y. S. 1; Lawson v. Wallace & Kenney, 195 N. Y. S. 673; Myers v. Industrial Acc. Co., 218 Pac. (Calif.) 11.] The case of Koch v. Lehigh Valley R. Co., 216 N. Y. S. 609, cited by the defendants, is distinguished in the Weisburg case.

However, defendants contend that it would be unreasonable for the commission to rule that Thomas should have told claimant, when the former found the latter in the hospital, that he would have to be moved to another hospital and get another doctor, regardless of

how much inconvenience and suffering it might have caused claimant. However, this was a matter for the attention of the commission. Thomas told claimant: "The hospital is the place for you" and not to worry about anything. The hospital in question seemed to meet the approval of Thomas. What was said in the Weisburg case, l. c. 4, meets this assignment of defendants. "However, if a demand is made upon him for medical attendance, even though the employer has engaged the services of a physician, he must tender the services of another or employ the physician already engaged if he would avoid liability. If such tender is refused, he could not be held liable for medical attendance. *If he simply consents that a physician chosen by the employee shall continue to care for claimant, he has failed to provide medical attendance; his act is one of benevolent neglect."* (Italics ours.)

We think that the award of the commission must be affirmed. However, it appears that the award is excessive in the amount of $86 in that 43 of the trips that claimant made to Dr. Benson's office for treatment were after the expiration of 90 days after the injury. The doctor charged $2 for each of these trips. Under the statute, section 3311(c) as amended (see Laws 1931, p. 381) the employer is required to furnish medical aid only during the first ninety days after the injury. If claimant will within ten days remit the sum of $86 from the award, the judgment will be affirmed, otherwise, it will be reversed and the cause remanded. All concur.